## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Civ. No. 17-359 (KM) |
| **v.** | |
| **YASMIL MINAYA,** | **OPINION & ORDER** |
| **Defendant.** | |

Defendant Yasmil Minaya filed an omnibus set of motions. (DE 84) Most I decided by a prior order, entered after full briefing, multiple supplemental submissions, and oral argument. (Order, DE 101, entered April 1, 2019)[1] I reserved decision, however, as to two motions:

(1) Defendant's motion to suppress a false driver's license allegedly seized from his person during an automobile stop.

(2) Defendant's motion for discovery and an evidentiary hearing to determine whether certain wiretap intercepts in the Dominican Republic should be suppressed.

After oral argument on April 1, 2019, the government submitted an additional letter brief (DE 106), and defense counsel submitted a supplemental reply (DE 107). On April 10, 2019, I convened an evidentiary hearing on the two reserved motions. (*See* DE 110.) This opinion and order constitute my resolution of those motions.

---

[1]     The omnibus motion and submissions in response filed before oral argument on April 1, 2010, include DE 84, 90, 91, 92, 93, 95, 96, 97, and 98.

A motion to dismiss the enhanced penalty information was granted on consent, pursuant to the government's agreement to apply the recently enacted First Step Act to pending cases. (*See* DE 104.)

## I. MOTION TO SUPPRESS FAKE DRIVER'S LICENSE

According to State police reports and exhibits attached to the government's papers (DE 90), the background of this motion is as follows.

On January 5, 2015, the New Jersey State Police had Minaya under surveillance. Minaya switched a single set of dealer license plates between automobiles, eventually placing them on a black Honda Civic. He then drove the Civic in a manner that suggested he was attempting to evade surveillance. After a stop at a New Jersey dealer, he drove off in an Acura TL, bearing the same dealer plates that had been on the Civic. Stopping at a pizzeria, he made a cellphone call. His car was approached by four individuals who, in the officers' estimation, spotted the surveillance car and abruptly walked away. Minaya entered and later exited from the pizzeria and got into the parked Acura, at which point the NJSP officers approached him.

Minaya identified himself as "Freddie" and displayed a Pennsylvania photo driver's license in the name of "Freddie Garcia Ramos." He consented to a search of the car. The car was temporarily impounded so it could be searched; despite Minaya's consent, the officers obtained a search warrant the following day. The car was returned to Minaya on January 8, 2015.

The premise of Minaya's motion to suppress—understandably, given the manner in which the government had presented the facts—was that the fake driver's license had been taken from him during the encounter outside the pizzeria. His motion focused on the voluntariness, or not, of that encounter. The government's responding papers, too, focused on that issue. The defendant's motion presented very little to suggest a triable evidentiary dispute as to the officers' possession of reasonable suspicion, assuming that was necessary. I nevertheless ordered an evidentiary hearing to establish the facts about the encounter between the NJSP and Minaya on January 5, 2015.

On April 5, 2019, however (*i.e.,* after oral argument, but several days before the scheduled evidentiary hearing), the government filed a supplemental

letter suggesting that the entire premise of the motion and their opposition to it had been incorrect. (DE 106) The government acknowledged that it intended to introduce in evidence a copy of the fake driver's license, and that the officers had seen it during the encounter on January 5, 2015. The license, however, had not been seized or copied during the police encounter on January 5, 2015.

Rather, the police had obtained a copy of the license three days later, on January 8, 2015. The government submitted copies of the paperwork by which Minaya recovered the impounded vehicle from the State police precinct on January 8, 2015. (Ex. A to letter, later introduced as Exhibits G1 and G2 at the evidentiary hearing.) The Vehicle Release Form states that the car was "Released to Freddie Garcia 1/8/2015." Attached to the Vehicle Release Form is a photocopy of the fake driver's license in the name of "Freddy Garcia." The photo on the license is readily identifiable as that of defendant Minaya. That, said the government, was the source of the photocopied driver's license that is now in its possession.

It follows, the government argued, that there had been no relevant seizure of the defendant or his driver's license. The license was not taken from the defendant during the police encounter on January 5. He voluntarily presented the license as identification on January 8, so that he could recover the impounded vehicle. So, even assuming for purposes of argument that the earlier police encounter had constituted an illegal seizure of Minaya, it would make no difference.

At the evidentiary hearing, I heard briefly from the government's witness on this issue, NJSP Det. Sgt. Vittorio Flora. Flora confirmed the government's description of the events. In particular, he testified that he did not seize the driver's license on January 5, 2015. (Tr. 86) He confirmed that Mr. Minaya came to the State police barracks to pick up the seized vehicle on January 8, 2015. It was then that Minaya filled out the Vehicle Release Form and identified himself with the fake "Freddie Garcia" driver's license, which the

3

police then photocopied. This photocopy, Flora testified, was the one now in the government's possession.[2] (Tr. 87–89; Exs. G1, G2)

Questioned about police procedures, Det. Sgt. Flora testified that the person picking up the car did not need to be Mr. Minaya:

> Q. When [Minaya] provided you the license and signed that form, did he do so voluntarily?
>
> A. Yes, sir.
>
> Q. Was it possible for someone else other than Mr. Minaya to pick up the car that day at the state police barracks?
>
> A. Yes, sir.
>
> Q. Okay. Who else could have picked up that car?
>
> A. Usually it's the owner or a representative of the owner with a document stating that they're releasing that vehicle to that person.
>
> For example, in this case, if it's a dealership or whatever, it would be a representative from that dealership, if it's the insurance company.
>
> In this case it's – it was a dealer plate on the vehicle, so it would be a representative of the dealership –
>
> . . . -- who had proof of ownership.

(Tr. 89–90)

Minaya's decision to appear and present the fake license, then, was voluntary:

> Q. Okay. So when Mr. Minaya provided that – made the decision to come and provide you his license, that was not by any compulsion by you?
>
> A. No, sir.

---

[2]    Flora stated that he "possibly" snapped a cell phone photo of the license on January 5, 2015. (Tr. 91) If there is such a photo, the government has not sought to introduce it in evidence.

(Tr. 90)

At the close of this direct examination, I obtained a firm representation from the government that it did not seek to introduce evidence that Minaya displayed the fake ID during the January 5, 2015 police encounter. Instead, the government would content itself with offering evidence that Minaya had presented the fake ID to recover the car from the police on January 8, 2015. (Tr. 90)

With the suppression issue thus narrowed, defense counsel cross-examined briefly regarding the circumstances of the January 5 encounter. But the issue, as defense counsel acknowledged (Tr. 92–93), had evolved into one of (at most) taint: whether, assuming *arguendo* that the January 5 encounter violated the Fourth Amendment, the fake ID presented three days later should be suppressed as a "fruit of the poisonous tree." As to that, defense counsel was content to "leave the evidence as it is and let the Court make its decision." (Tr. 93) Although the government objected, in light of its shift of theories, I did permit the defense to argue that the January 5 encounter tainted the January 8 evidence.

> Under the Court's precedents, the exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relevant here, "evidence later discovered and found to be derivative of an illegality," the so-called " 'fruit of the poisonous tree.' " *Segura v. United States,* 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L.Ed.2d 599 (1984). But the significant costs of this rule have led us to deem it "applicable only … where its deterrence benefits outweigh its substantial social costs." *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L.Ed.2d 56 (2006) (internal quotation marks omitted). "Suppression of evidence … has always been our last resort, not our first impulse." *Ibid.*

*Utah v. Strieff,* 136 S. Ct. 2056, 2061 (2016). "The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *United States v. Ceccolini,* 435 U.S. 268, 279 (1978). So even where a search has been

unreasonable, the scope of the exclusionary rule has been confined to contexts where its deterrent effect justifies the systemic costs of excluding relevant evidence.

Most pertinent here is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff,* 136 S. Ct. at 2061 (quoting *Hudson,* 547 U.S. at 593). The attenuation doctrine is concerned with the closeness, or not, of the causal connection between the alleged Fourth Amendment violation and the items to be offered in evidence. Where the constitutional violation consists in the seizure of the very items later offered in evidence, the exclusionary rule's efficacy as a deterrent is clear; the government, deprived of the very evidence it seized, forfeits the benefit of its unconstitutional conduct. Where, however, other acts and events intervene between the violation and the later, indirect development of evidence, the efficacy of the exclusionary sanction is less clear; the deterrent game may not be worth the exclusionary candle. In short, the attenuation inquiry embodies a balance of the costs and benefits of exclusion, and therefore "[n]o single fact is dispositive." *Brown v. Illinois,* 422 U.S. 590, 603, 95 S. Ct. 2254 (1975).

Suppression therefore will not be ordered merely because a Fourth Amendment violation is a "but-for" link in the chain that led to the discovery of the evidence. *United States v. Mendez,* 885 F.3d 899, 909 (5th Cir. 2018) (citing *Hudson v. Michigan,* 547 U.S. 586, 592, 126 S. Ct. 2159, 2164 (2006); *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S. Ct. 407 (1963)). The key question is whether the evidence "has been come at by *exploitation* of that illegality or instead by *means sufficiently distinguishable* to be purged of the primary taint." *Brown,* 422 U.S. at 599, 95 S. Ct. at 2259 (emphasis added; citations omitted).

6

A court's determination of whether intervening events are sufficient to "purge the primary taint" is governed by three factors:

1. The "temporal proximity" of the unconstitutional conduct and the discovery of the evidence.
2. The "presence of intervening circumstances."
3. The "purpose and flagrancy of the official misconduct."

*Brown v. Illinois*, 422 U.S. at 603–04, 95 S. Ct. at 2261–62.

Applying the *Brown* factors, I conclude that the government's evidence that Minaya presented a fake driver's license on January 8 should not be suppressed. I rely here on the exhibits and the testimony of Det. Sgt. Flora, which I found credible. The defendant did not testify.

Taking the third factor first, if the January 5 encounter was illegal, it was not flagrantly so. At most, the officers erred in making an on-the-spot judgment call as to the presence of reasonable suspicion, assuming reasonable suspicion was required.[3]

Moving to the first, temporal-proximity factor, three days had passed since the allegedly wrongful seizure. *See generally United States v. Delancy*, 502 F.3d 1297, 1310–11 (11th Cir. 2007) (surveying cases finding taint where

---

[3]    The defendant's one-page argument on this point cites a traffic-stop case, *Delaware v. Prouse*, 440 U.S. 648 (1979) (stopping an automobile and detaining its occupants is a seizure requiring reasonable suspicion). (DE 84, Def. Brf. at 20) Officers need not possess any threshold level of suspicion, however, to approach a person in a public place and ask questions. Because it is not necessary to resolve it, I will set aside the vexed question of how to distinguish such an ordinary street encounter from a traffic-stop seizure when the subject is inside a parked vehicle. *Compare United States v. Edwards*, 53 F.3d 616, 617 (3d Cir. 1995) (finding seizure where police vehicles blocked in a parked car), *with United States v. Williams*, 413 F.3d 347, 353–54 (3d Cir. 2005) (no seizure where officers approached parked vehicle on foot and observed suspicious activity from a distance).

I note in passing that (although the defendant did not know this) the officers possessed the results of the DEA investigation up to that point, in addition to their contemporaneous observations, summarized in the NJSP report. Among other things, they had observed Minaya's change of vehicles and swap of license plates; evasive driving maneuvers; and the apparent abandonment of a meeting with four individuals when they spotted the officers on surveillance.

minutes had passed between illegal seizure and giving of consent, but denying suppression where days had passed). The defendant was not in custody, and any coercive effect of the January 5 encounter had surely dissipated by then.

As to the third factor, the events intervening between the January 5 encounter and the January 8 recovery of the car weigh against suppression. Even where a defendant remains in police custody, the courts have looked to whether the alleged coercion remained in effect, or whether circumstances intervened to change that *status quo. See Delancy,* 502 F.3d at 1311–12 (surveying cases).

As noted, Mr. Minaya was (at most) briefly detained on January 5; his car was impounded from January 5 to January 8, but he himself was not in custody or otherwise subject to potential police coercion. On January 8, Minaya was not seized, searched, or otherwise coerced to present the driver's license. Of course, to recover the car, somebody would have had to present evidence of ownership or rightful possession of the vehicle. Minaya's prior presentation of the fake ID (assuming it occurred) put him in a corner; if he now displayed identification bearing his true name, that would predictably arouse suspicion. But there were other options. The true owner of the car, for example, could have recovered it. As Flora testified, the plates were dealer plates, suggesting that the dealer[4] could have established a legitimate entitlement to possession.

Suppression of Minaya's voluntary presentation of the fake driver's license would not be a reasonable application of the exclusionary rule. The rule is designed to deter police misconduct by removing the incentive or benefit. The voluntary presentation of a fake driver's license for administrative purposes, days after the encounter, is too attenuated from the original seizure (if that is what it was) to serve that deterrent purpose. The presentation of the fake

---

[4] The dealership, located in Hazleton, Pennsylvania, is identified in the NJSP report. According to the NJSP report, Minaya's travels on the date in question included a stop at a New Jersey dealership at which one of the car/plate switches occurred.

driver's license on January 8 was an independent, uncoerced, volitional act by the defendant. It was accomplished by means entirely distinguishable from the alleged forcible seizure of the defendant on January 5. It was thus "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun,* 371 U.S. at 486–87.

To the extent that the defendant sought to suppress his presentation of the driver's license on January 5, 2018, his motion is moot. To the extent the motion is directed to evidence that the defendant presented the fake driver's license when he picked up the impounded car on January 8, 2015, it is denied.

## II.    MOTION TO SUPPRESS DOMINICAN WIRETAP

The government has produced in discovery recordings and transcripts of conversations intercepted pursuant to a wiretap in the Dominican Republic (the "DR wiretap"). The government will seek to introduce in evidence some of those intercepts, including calls to which Minaya (in the United States) was allegedly a party. Minaya has moved for discovery and a hearing in aid of a motion to suppress. Discovery seems to have been thorough, indeed well in excess of what is required by Fed. R. Civ. P. 16,[5] and the defendant's motion offered little in the way of concrete evidence. Nevertheless, in supplemental submissions, Minaya pointed to discovery materials that might be suggestive of a joint U.S./Dominican investigation. I ordered an evidentiary hearing to help establish whether this foreign wiretap might be attributable to the U.S. authorities, and therefore subject to the requirements of U.S. law. At the close of the hearing, I expressed the opinion that the briefing in support of the

---

[5]    The target of the DR Wiretap was one Wellington Orlando Luna de la Cruz ("Luna Cruz"). The government represents that it has turned over to Minaya's counsel all of the documents and recordings it received from the Dominican government pursuant to a Mutual Legal Assistance Treaty ("MLAT") request. These include the wiretap recordings and authorizing court orders. There is no allegation that the government failed to make a good faith effort to obtain all relevant materials from a separate sovereign. *See United States v. Yousef,* 327 F.3d 56, 129–30 (2d Cir. 2003). Other evidentiary materials from the United States, including emails and agency reports, have been turned over and were offered in evidence.

motion for a suppression hearing was sufficient, and no party sought to file additional briefing in connection with suppression proper.

## A. Applicable Standards

Wiretap interceptions within the United States are subject to the requirements of (a) the Wiretap Act, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *see* 18 U.S.C. § 2510 *et seq.,* and (b) the Fourth Amendment to the U.S. Constitution, *see Katz v. United States,* 389 U.S. 347 (1967). This, however, was a wiretap conducted by foreign authorities in a foreign country, the Dominican Republic, and the applicable standards are different.

### 1. Wiretap Act

The Wiretap Act has no application to wiretaps conducted outside of the United States. *See United States v. Peterson,* 812 F.2d 486, 492 (9th Cir. 1987); *United States v. Maturo,* 982 F.2d 57, 60 (2d Cir. 1992). Indeed, it is difficult to envision how the Act's procedures even could apply extraterritorially; there is, for example, no U.S. District Court with jurisdiction in the Dominican Republic to which the government could apply for a Title III order.

For purposes of extraterritoriality, the relevant location is not the location or nationality of any person whose voice might have been intercepted; it is the site at which the interceptions occurred. *See Huff v. Spaw,* 794 F.3d 543, 547 (6th Cir. 2015) ("Where determining whether an alleged interception is extraterritorial, and therefore beyond the jurisdiction of federal courts as a question arising under title III," the court must "look to 'where the interception took place.'") (quoting *United States v. Cotroni,* 527 F.2d 708, 711 (2d Cir. 1975)). Here, it is undisputed that the wiretap interceptions occurred in the Dominican Republic, pursuant to orders of a Dominican court, and were serviced by a Dominican telephone service provider.

I therefore set aside the Wiretap Act. The remainder of this opinion deals with the defendant's Fourth Amendment challenge.

10

## 2. Fourth Amendment

"[T]he Fourth Amendment's exclusionary rule, which requires that evidence seized in violation of the Fourth Amendment must be suppressed, generally does not apply to evidence obtained by searches abroad conducted by foreign officials." *United States v. Lee*, 723 F.3d 134, 139 (2d Cir. 2013) (citing *United States v. Janis*, 428 U.S. 433, 455 (1976)). The exclusionary rule is designed to deter the police from committing Constitutional violations; assuming the United States is concerned by the actions of foreign police, the evidentiary rulings of a U.S. Court "are unlikely to influence [their] conduct." *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012). Therefore, information gathered abroad by foreign police will not be excluded from evidence in a U.S. court "simply because the procedures followed in securing it did not fully comply with our nation's constitutional requirements." *Cotroni,* 527 F.2d at 711.

In general, then, "wiretap evidence may be admissible when foreign officials, acting on their own to enforce foreign law, properly follow their own law in obtaining the evidence [citing *Cotroni,* 527 F.2d at 711–712 ], even where the subject of the foreign search is an American citizen. *See United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976) . . . ." *United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992). *See also Terrorist Bombings of U.S. Embassies in West Africa,* 552 F.3d 157, 167 (2d Cir. 2008); *United States v. Peterson,* 812 F.2d 486, 491 (9th Cir. 1987) (Kennedy, J.) ("local law of the Philippines governs whether the search was reasonable").

*United States v. Castro,* 175 F. Supp. 2d 129 (D.P.R. 2001) involved a U.S. motion to suppress a Dominican wiretap, like the one here. *Castro* first considered the legality of the wiretap under Dominican law. It apparently did not, like this Court, possess the order actually authorizing the wiretap; it nevertheless accepted a subsequent order of a Dominican arraignment judge which impliedly accepted the legality of the intercepts. *Id.* at 134. Surveying

current (post-2000) Dominican law, the court concluded that an application of a prosecutor to a judge, as occurred in this case, is required.[6]

Here, the government submitted copies of judicial orders from the Dominican Republic, based on the affidavit of a prosecutor, that appear on their face to authorize the DR Wiretap at issue. SA Pulido testified that the order was reported to her as having been obtained in conformity to local law (she claimed no personal expertise). At any rate, the defendant submitted no evidence that the DR Wiretap was *not* duly authorized under Dominican law.[7]

Nevertheless, there are narrow circumstances under which wiretap interceptions from a foreign country may be barred from being received in evidence in a U.S. criminal trial. To the general rule that the exclusionary rule does not apply extraterritorially, the courts have recognized two exceptions: the "shocks-the-conscience" exception and the "joint venture" exception.

The first exception invokes the bedrock test of due process; it comes into play where the conduct of the foreign police "shock[s] the judicial conscience." *United States v. Callaway,* 446 F.2d 753, 755 (3d Cir. 1971); *see also United States v. Barona,* 56 F.3d 1087, 1091 (9th Cir. 1995). Such conduct must involve, not mere illegality, but conduct that is "egregious," such as "torture [or] terror," or brutal interrogation tactics. *United States v. Getto,* 729 F.3d 221, 228 (2d Cir. 2013). This first exception is concededly not involved here. *See United States v. Castro,* 175 F. Supp. 2d 129, 133 (D.P.R. 2001) ("The 'shocks the conscience' prong of the two-prong test is clearly not met and requires no discussion, unless it is shocking for law enforcement officers of two countries

---

[6]     This account appears to be consistent with an English translation of the relevant Dominican wiretap statute that is attached to defendant Minaya's omnibus motion (DE 84) as Exhibit M.

[7]     Applications and orders (originals and translations) dating from November 12, 2014 and January 6, 2015 are attached to the motion papers of the defendant and the responding brief of the United States. (DE 84 Ex. C; DE 90 Ex. B)

to exchange information in the investigation of major drug trafficking organizations."). I discuss it no further.

The second exception comes into play where the "United States' agents' participation in the [foreign] investigation is so substantial that the action is a joint venture between United States and foreign officials." *Barona,* 56 F.3d at 1091; *see also United States. v. Mitro,* 880 F.2d 1480, 1482 (1st Cir. 1989); *United States v. Delaplane,* 778 F.2d 570, 573–74 (10th Cir. 1985); *United States v. Mount,* 757 F.2d 1315, 1317–18 (D.C. Cir. 1985).[8] Minaya's motion focuses on this second, "joint venture" exception, and I will do so as well.

### B. The Evidence
#### 1. Pulido affidavit and direct testimony

On the "joint venture" issue, the United States introduced the affidavit of DEA Special Agent Roxana K. Pulido. ("Pulido Aff.", DE 96-1, introduced at hearing as Ex. D7) Pulido also testified in person at the evidentiary hearing, where she was subjected to cross-examination by the defense. The statements in her affidavit are supplemented by her testimony at the hearing. (The transcript of the hearing, April 10, 2019 is cited as "Tr.")

From October 2014 through February 2017, Pulido was assigned to the DEA's Santo Domingo country Office ("SDCO") in the Dominican Republic.[9] (Pulido Aff. ¶ 1; Tr. 7–9) She has experience and involvement with the DEA Special Agents involved in this investigation, as well as officers of the Dirección Nacional de Control de Drogas (the "DNCD"), a Dominican law enforcement

---

[8]     The Second Circuit has its own version of the test for applying U.S. "constitutional requirements" to foreign-gathered evidence. It has expressed unease about giving full scope to the Ninth Circuit "joint venture" test, and has required more stringently that the foreign authorities have acted as "virtual agents" of the United States. *See United States v. Maturo,* 982 F.2d 57, 61 (2d Cir. 1992). On the other hand, the Second Circuit has supplemented the exception to encompass cases in which the U.S. officials' cooperation with the foreign agents was "designed to evade constitutional requirements" that would otherwise have applied to them. *See id.; Lee,* 723 F.3d at 140; *Getto,* 729 F.3d at 233.

[9]     She is now a Group Supervisor with the DEA Caribbean-San Juan Division.

organization that investigates narcotics trafficking. Within the DNCD is a unit known as the sensitive Investigations Unit ("SIU"). That unit's members are background-checked by the DEA, but operate under the supervision of their Dominican superiors. Pursuant to an agreement between the governments, some SIU members receive training in the United States at the Quantico facility, the U.S. subsidizes some equipment costs, and DEA provides a monthly stipend to supplement salaries of SIU members. Those subsidies are not tied to any particular investigation. (Pulido Aff. ¶ 5; Tr. 10–11)

Pulido acted as a liaison to the DNCD/SIU. SDCO and SIU maintain separate offices. SDCO officials report to the DEA Group Supervisor and work with the country attaché. SIU officials report to Dominican officials in the DNCD. (Pulido Aff. ¶¶ 2–3; Tr. 12–13)

The target of the wiretaps at issue was a Dominican national, Mr. Luna-Cruz. Luna-Cruz resided in the Dominican Republic and used cellphones serviced by "Orange Dominicana," a Dominican service provider. (Pulido Aff. ¶ 4; Tr. 20–21)

Dominican law enforcement personnel applied for and obtained wiretap orders for Luna-Cruz's phones from a Dominican judge. (Pulido Aff. ¶ 4) The procedures for obtaining the orders complied with Dominican law (*id.*), and the defense did not establish the contrary. Copies of relevant applications and orders of the Dominican court, with English translations, were attached to both sides' papers. (DE 84 Ex. C; DE 90 Ex. M)

The DEA did not initiate the investigation of Luna-Cruz. The DEA neither requested nor initiated the wiretap application for Luna-Cruz's cell phones. Indeed, the DEA has no authority to initiate Dominican investigations, investigate violations of Dominican law, or make arrests in the Dominican Republic. Dominican law enforcement acted autonomously at all times and made all decisions about whether and how to conduct the Luna-Cruz wiretap investigation. (Pulido Aff. ¶¶ 6, 7, 8; Tr. 14, 18–19)

14

Once the wiretap order was obtained from the Dominican judge, the Dominican officials served it on the Dominican telephone provider. The DEA had no involvement in the process, and did not even see the wiretap orders until later, when the New Jersey investigators requested copies. The Dominican law enforcement personnel were responsible for operating and maintaining the interception equipment. The wire room (*i.e.,* the facility from which the calls were monitored) was divided between wiretap monitors and analysts. Those wiretaps and analysts were Dominican personnel, supervised by Dominican officials. When intercepts were deemed pertinent, the monitors would forward them to the analysts. (Pulido Aff. ¶ 9; Tr. 14–16, 19)

The U.S. DEA personnel were often present in the Dominican wire room. They did not act as wiretap monitors—*i.e.,* they did not themselves intercept and record the relevant calls. The U.S. and Dominican agencies shared information; indeed, that was the point of their cooperative arrangement. From time to time, DEA agents would talk to the analysts elsewhere in the building. The analysts would share information from the wiretap pertaining to trafficking activities in the U.S. that would be of interest to the DEA. (Tr. 15–18, 22, 68)

During the course of the wiretap of Luna-Cruz's phones, the SIU intercepted calls to and from the telephone of the defendant, Minaya, who was in the United States. (Pulido Aff. ¶¶ 6, 8) The SIU shared with DEA the information that Luna-Cruz was having narcotics-related conversations with Minaya.

In January 2015, the DEA opened its own investigation. (*See* DEA Case Initiation Report, dated Jan. 22, 2015 (Ex. D18) They did so because SIU had shared information from the wiretap indicating that people in New Jersey and New York were dealing with Luna-Cruz. (Tr. 22–23) Pulido passed the information to the DEA offices in New Jersey and New York. (Tr. 23) She would also share the information she received from New Jersey with the SIU. (Tr. 24)

From time to time, in her reports, Pulido referred to the investigation as a joint investigation. She did so because, as a liaison, she shared information with SIU and SIU shared information with her. Additionally, she is required when writing a report to include the names of all persons or offices who have access to the information. (Tr. 24–25, 68–69) Once DEA-New Jersey opened its own investigation, she included them in her reports. (Tr. 72)

The DR Wiretap, however, was a Dominican operation. No one at DEA told them to initiate the wiretap, to intercept or not intercept calls, or renew their application. (Tr. 25–26)

### 2. Pulido cross-examination and exhibits introduced by defense

The cross-examination focused on DEA-6 reports that used terminology tending to indicate that the investigation was a cooperative or joint one between the DEA-SDCO and the Dominican SIU.

One DEA-6 report dated January 29, 2015, for example, stated that "SDCO-SIU continues to monitor lines associated to this organization." (Tr.31; Ex. D1) Three others, dated February 15, 2015, February 13, 2015, and February 17, 2015, refer to "wire intercepts conducted by the Santo Domingo CO (SDCO) Sensitive Investigative Unit (SIU)" and the "SDCO-SIU wires." (Tr. 32–35; Exs. D2, D3, D4) The court accepted defense counsel's proffer that other reports used similar terminology.

Another DEA-6 report, dated February 18, 2015, contains the same phrase, and also states that "SCDO-SIU have obtained a new number for Orlando LUNA-Cruz," for which wiretap authorization would be sought. Pulido testified, however, that the SIU, not DEA, obtained that new number; she merely heard about it from SIU and reported it on the DEA-6. (Tr. 35–36; D5)[10]

---

[10]     The same report states that "the SIU is in the process of conducting judicial wiretap intercepts on the new number." (Tr. 69; Ex. D5)

Another DEA-6, dated March 17, 2015, states that "DEA New Jersey (NJ) Group HIDTA #4/Paterson Post of Duty along with the DEA Santo Domingo Country Office (SDO), and the Internal Revenue Service (IRS) are conducting a joint investigation involving a Dominican based drug trafficking organization [that is] transporting and distributing kilograms of heroin into the US." The same report states that the organization is being investigated through "Title III wiretaps."[11] (Tr. 38–39; Ex. D6)

A DEA-6 dated October 30, 2015, has in the indexing section at the top an item labeled "Box number 9 Other Officers:". Listed in that box are "DNCD/SIU and New Jersey Patterson [sic] HIDTA." (Tr. 51; Ex. D10) Another, dated November 4, 2015, states that "SDCO SIU is currently monitoring" another phone. Pulido explained that this did not mean U.S. personnel were acting as monitors; she meant only that SIU was monitoring and sharing items of interest with the DEA. (Tr. 52; Ex. D11) Another report suggested that the IRS had shared information with the SIU. (Tr. 53; Ex. D12) Another reference to SDCO intercepting calls, she said, "inadvertently" omitted SIU. (Tr. 54; Ex. D13)

A DEA-6 report dated November 30, 2015, states that attempts to intercept communications of members of the Luna-Cruz organization in New Jersey have been unsuccessful, largely because they keep switching devices. (Tr. 56; Ex. D15) Another report, dated March 27, 2015, suggested that New Jersey officials then had a sufficient basis to apply for their own wiretap order. (Tr. 57–59; D14)

SA Pulido underscored that when she used terms such as "in conjunction with" or referred to a "joint investigation," she meant only that the

---

[11]     An impossibility, for the reasons set forth above. Title III, *i.e.*, the Wiretap Act, does not operate extraterritorially, and Title III does not grant a U.S. court jurisdiction to authorize a wiretap in the Dominican Republic. SA Pulido made it clear that this was not a reference to any Dominican statute, and that indeed she is unfamiliar with the law governing wiretaps in the Dominican Republic. (Tr. 39)

U.S. and foreign agencies were working alongside each other and sharing information. (Tr. 40–41, 70) The DEA's vetting of SIU personnel, she stated, was to ensure that they would not be working with "corruptible" officials; the DEA did not choose who would staff the wire room. (Tr. 43–44)

SA Pulido recalled that the DEA had opened its own investigation, based on information received from the SIU and its wiretap, in January 2015. She was unable to recall the precise date on which she learned that the DR Wiretap contained calls implicating activities in the U.S. (Tr. 59–64) Later recross examination suggested that SA Pulido had email communications referring to such intercepts on January 20 or 21, 2015, and that she, at the request of the New Jersey DEA, obtained copies of the Dominican wiretap orders from SIU. (Tr. 78–81; Ex. D19) The case opening memo was dated January 22, 2015. (Tr. 64–66; Ex. D18)

### C. Analysis

As to the "joint venture" issue, I begin with the general point that I observed SA Pulido's demeanor and found her to be a credible witness. Her account was internally consistent and sensible. It fit with the external evidence, such as the Dominican authorities' application for the wiretap order from the Dominican judge. There was nothing implausible about the notion that law enforcement authorities in our two countries share intelligence, but that information-sharing does not turn one into a tool of the other.

Factors relevant to the determination of whether there is a "joint venture" between American and foreign law enforcement include the following:

1) Whether American authorities initiated the investigation in the foreign country.
2) Whether American authorities were involved in the decision to seek the foreign wiretap.
3) Whether American officials controlled, directed, or supervised the foreign wiretap.

4) Whether American officials participated in the implementation of the wiretap and the recording of conversations.

*Valdivia,* 680 F.3d at 52. *Accord United States v. Marte,* 2018 WL 4571657 at *6 (D. Mass. Sept. 24, 2018) (Robertson, U.S.M.J.). *See also United States v. Maturo,* 982 F.2d 57, 61 (2d Cir. 1992). On all four factors, the defendant's showing is weak.

First, the American authorities did not initiate the DR Wiretap investigation. The wiretap application was made by a Dominican prosecutor to a Dominican judge. The target was a Dominican national, Mr. Luna-Cruz. The SIU was investigating Luna-Cruz's alleged narcotics trafficking, in violation of Dominican law. It was not until January 22, 2015 that the U.S. DEA opened an investigative file. For all that appears in this record, the U.S. authorities learned about Mr. Minaya's alleged involvement *as a result* of the DR Wiretap's interception of calls to and from Minaya in New Jersey.

Second, and relatedly, the American authorities were not involved in the decision to seek the foreign wiretap. No one at the DEA told the Dominican authorities to initiate the wiretap, to intercept or not intercept calls, or to renew or not renew the wiretap applications. U.S. law enforcement personnel, even if they had wished to make such an application, possessed no authority to do so. Nor was there evidence of indirect involvement in such an application. Ms. Pulido, the only witness with actual knowledge, testified credibly that the Dominican authorities obtained the DR Wiretap orders in pursuit of their own investigation of Luna-Cruz. As a supervisor, she was in a position to know that no American DEA officer participated in the application process.

Third, American officials did not control, direct, or supervise the DR Wiretap. The Dominican wire room was staffed by monitors and analysts from the SIU, who were supervised by Dominican officials. SIU personnel operated the interception equipment.

Fourth, American officials did not participate in the implementation of the DR Wiretap or the recording of conversations. Dominican law enforcement officials obtained the wiretap orders and served them on the Dominican telephone service provider. The DEA apparently did not even see the Dominican wiretap orders until SA Pulido later requested copies on behalf of the New Jersey DEA. U.S. DEA personnel were often present in the wire room and the building in which it was located. They did not act as monitors or analysts, however. Rather, when particular DR Wiretap intercepts appeared to involve persons in the United States, the Dominican SIU analysts would share them with the U.S. agents, who would listen to them.

All of the *Valdivia* factors, then, weigh against any finding of a "joint venture."[12]

What the defense offered was general evidence of cooperation between the U.S. and Dominican authorities, and quotations from DEA reports that blurred or failed to observe the distinction between the two.

The defense offered no witnesses and no positive evidence as to the manner in which investigations in the Dominican Republic, or this investigation in particular, were conducted. The thrust of the defense presentation was that SA Pulido's memos attributed investigative activities to DSCO and SUI or that they explicitly or impliedly stated that the two acted together. Pulido's explanation—that a "joint" investigation meant one in which

---

[12]    The evidence also fell far short of satisfying the Second Circuit's alternative test, which would find sufficient involvement if the U.S. cooperation with the foreign agents was "designed to evade constitutional requirements" that would otherwise have applied to them. *See* n.8, *supra*. That test might apply to a scenario in which U.S. authorities had targeted Minaya, and purposely obtained a wiretap order in the Dominican Republic to avoid the requirements of U.S. wiretap laws. The evidence is to the opposite effect. As noted, the DR Wiretap was instituted by the SIU, who were investigating another subject, Luna-Cruz. U.S. agents had no authority to seek a wiretap order in the Dominican Republic, and were not involved in the decision to seek one. Information about Minaya was not the basis for the Dominican authorities' wiretap application. Indeed, the information flowed the other way; SA Pulido learned about Minaya's alleged domestic trafficking activities from the DR Wiretap and shared those intercepts with the New Jersey DEA.

the participants share information—was plausible. So too was her statement that she had been instructed to include on the face of her DEA-6 reports the names of all agencies with which the information was shared.[13]

Veterans of any bureaucracy may recognize the language of interagency cooperation, in which the acts of participants are attributed to all. As SA Pulido pointed out, however, the phraseology of her memos did not change the facts on the ground by which a joint venture is measured. The evidence falls far short of establishing a "joint venture," a term of art under *Valdivia* and the other cases cited above.

The most pertinent case law supports that conclusion:

In *Valdivia* itself, Aruban authorities authorized a wiretap in advance of the involvement of American law enforcement; U.S. officials did not request or manage the wiretap; the wiretap was authorized by Aruban courts; and it was monitored and implemented by Aruban personnel. 680 F.3d at 52[14] The defendant introduced evidence that a DEA agent had been present in Aruba for significant portions of a wiretapping investigation, that the agent had referred in testimony to "*our* intercept investigation," and that the district court found participation. *Id.* (emphasis in original). This, *Valdivia* held, in terms that read onto the facts of this case, fell far short of a "joint venture."

*United States v. Marte,* 2018 WL 4571657 at *6 (D. Mass. Sept. 24, 2018) (Robertson, U.S.M.J.), involved a motion for discovery in aid of a motion to suppress the results of a Dominican wiretap, like this one. The court held an

---

[13]    I give no weight, by the way, to SA Pulido's references to the DR Wiretap orders as "Title III" orders. She obviously was using familiar U.S. terminology in a generic manner. (The reference would be to the Wiretap Act, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, see 18 U.S.C. § 2510 et seq.) There is no evidence that any order for these Dominican interceptions did issue or even could have issued under Title III, a U.S. statute. The evidence does not indicate that there is any Dominican "Title III" to which SA Pulido could have been referring.

[14]    These factors parallel our case. On the other hand, U.S. personnel never entered the wire room, and the results of the Aruban wiretap were shared only after it was concluded. *Id.*

evidentiary hearing on the "joint venture" issue.[15] *Id.* at *8. As in this case, Pulido stated that the DEA had no involvement in obtaining the Santo Domingo wiretap, but became involved in the investigation of defendant Marte when the Dominican authorities notified her that the subject of the wiretap was talking to individuals with U.S. area codes, including Marte. The DEA agents in Santo Domingo acted as liaisons and shared information. They did not participate in the wiretap application process, the running of the wiretap, or the investigation of the Dominican national who was the subject of the wiretap. The court also noted that, according to the Country Attaché, as a matter of policy the DEA did not initiate investigations in the Dominican Republic. *Id.*

As in this case, "Dominican authorities' sharing of information with the DEA and the DEA's provision of funding, training, and equipment to Dominican law enforcement did not transform the Dominican investigation into a cooperative effort." *Id.* at 9.

> "The fact that Dominican law enforcement authorities shared information with the DEA did not make it a joint investigation." *Marte*, 2018 WL 988062, at *4 (citing *United States v. Lee*, 723 F.3d 134, 141 (2d Cir. 2013); *Castro*, 175 F. Supp. 2d at 133). See *United States v. Gomez Castrillon*, No. S2 05 Cr. 156(CM), 2007 WL 2398810, at *4 (S.D.N.Y. Aug. 15, 2007) (although there was information sharing between Columbia and the United States, there was no joint investigation where Columbian authorities conducted their own investigation and the DEA played no role in monitoring wiretaps or translating the results). Similarly, the fact that the United States provided financial and technical support to the Dominican authorities was not sufficient to transform the Dominican investigation into a joint operation. According to SA Barron, American assistance to the Dominican Republic was directed at narcotics interdiction in general, not at a particular investigation (id. at 25, 41-42). *See Maturo*, 982 F.2d at 60 (Turkish authorities were not agents of the United States notwithstanding their receipt of "money, information, and

---

[15]    As it happens, the DEA Agent's testimony incorporated input from, *inter alia*, SA Pulido.

wiretapping equipment" from the DEA); United States v. Cabalcante, CASE NO. 4:09-CR-194, 2014 WL 12694161, at *6 (E.D. Tex. Feb. 18, 2014) (citation omitted) ("While funding is a factor to be considered in the determining the nature of the relationship, that factor is not dispositive. More evidence is needed to establish agency or the existence of a joint venture between the DEA and Columbian officials."). "The investigation of crime increasingly requires the cooperation of foreign and United States law enforcement officials, but there is no reason to think that Congress expected that such cooperation would constitute the foreign officials as agents of the United States...." *United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984).

*Id.*

The facts of these exemplar cases, *Valdivia* and *Marte,* are, if not precisely identical, at least closely parallel to the facts developed in the evidentiary hearing here. The defense has not cited a case with remotely comparable facts that resulted in a finding of "joint venture" and suppression. While attempting to cast doubt on the government's evidence, it has not really produced any positive evidence of the existence of such a joint venture.

Accordingly, I find that the evidence does not demonstrate that the DR Wiretap was the product of a "joint venture" between the U.S. and Dominican law enforcement agencies. It follows that the exclusionary rule does not apply and suppression would not be warranted.

## ORDER

Accordingly, IT IS this 16th day of April, 2019

ORDERED as follows:

1. The portion of the omnibus motion (DE 84) that sought suppression of evidence that the defendant presented a fake driver's license on January 5, 2018, is denied as moot. To the extent the motion is directed to evidence that the defendant presented the fake driver's license when he picked up the impounded car on January 8, 2015, it is DENIED.
2. The portion of the omnibus motion (DE 84) that sought a hearing regarding the DR Wiretap has been GRANTED to the extent that the government has produced documentary evidence and been compelled to produce SA Pulido for cross-examination, but is otherwise DENIED.
3. To the extent the defense sought suppression of the intercepts from the DR Wiretap, the motion is DENIED.

**Kevin McNulty**
**United States District Judge**